UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

00 SEP 28 PM 3: 25

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOANN BULLOCK                          )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )  Civil Action No. 99-S-243-NE
                                       )
WILLIAM S. COHEN, IN HIS               )
OFFICIAL CAPACITY AS SECRETARY         )
OF DEFENSE OF THE UNITED STATES        )
                                       )
        Defendant.                     )

ENTERED

SEP 2 8 2000

### MEMORANDUM OPINION

Plaintiff, Joann Bullock ("Bullock"), was rejected for promotion to the position of Contract Administrator by her employer, the Defense Logistics Agency, a component of the United States Department of Defense. Bullock claims she was rejected because of her age. She filed this action on February 2, 1999, alleging violations of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 633 *et seq.* The action presently is before the court on defendant's motion for summary judgment. Upon consideration of the motion, pleadings, briefs, and the parties' evidentiary submissions, the court concludes defendant's motion is due to be granted.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally id.*; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

2

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The nonmoving party must put forth more than a "mere 'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

3

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

## II. SUMMARY OF FACTS

Bullock was working as a secretary for the Defense Contract Management Command of the Defense Logistics Agency, a GS-05 grade position, on the dates relevant to this action.[1] She was born on January 28, 1940, and thus was almost 57 years old on January 14, 1997, the date upon which she received notice that she was deemed

---

[1] Memorandum in Opposition to Defendant's Motion for Summary Judgment (doc. no. 41) at 1.

"not qualified" for promotion to the position she sought.[2]

On or around December 6, 1996, the Defense Contract Management Command posted a Job Opportunity Announcement ("JOA") for the position of Contract Administrator, GS-1102-07.[3] The number "1102" referred to the "Contract Specialist" job series, while "07" referred to the opening pay grade. There were three such positions to be filled.[4] Selected applicants would begin as a Contract Administrator trainee with promotion potential to the pay grade of GS-11.[5] Under the heading "Qualification Requirements," the JOA provided:

> Applicant must have one year of specialized experience which is in or is directly related to the line of work of the position to be filled and which has equipped the applicant with the particular knowledge, skills, and abilities to successfully perform the duties of the position. This experience must have been at least equivalent to the GS-05. Candidates must have served an aggregate of one year at the GS-05 grade level in order to meet the Office of Personnel Management time-in-grade requirement. Specialized experience is that which involved contract administration functions.[6]

The duties of those persons selected to fill the three GS-1102-07 Contract Administrator trainee positions would include:

---

[2] *Id.*

[3] *Id.* at 1, 2.

[4] Memorandum in Support of Defendant's Motion for Summary Judgment (doc. no. 33) at 1.

[5] *Id.*

[6] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment, Ex. A., Ex. 1.

> [P]erform[ing] a full administration on a group of
> contracts and assist[ing] higher graded administrators in
> administering portions of more complex types.
> Administrat[ing] up to the point of signature, a group of
> fixed price contracts with a variety of special
> provisions such as progress payments, options, flexible
> sizes, etc. Coordinat[ing] contractual action with other
> functional specialists, contractor or procurement command
> personnel. Perform[ing] analysis of contractor's
> proposals pertaining to changes, requests for progress
> payments and proposals for definitizing orders under
> Basic Ordering Agreements. Assist[ing] in the review,
> analysis and processing of more complex contractual
> actions or portions of overall tasks as assigned by the
> ACO or higher graded contract Administrator....[7]

Interested applicants were required to submit three documents: a résumé or form 171; responses to "KSAs"[8]; and a performance appraisal.[9] Applications were to be submitted during a two week window, between December 6 and 20, 1996.[10]

Bullock submitted an application including a form 171 and responses to the KSAs on December 16, 1996.[11] She neglected to

---

[7] Id.

[8] KSA stands for Knowledge, Skills, and Abilities. These particular KSA's were: 1) ability to perform price/cost analyses; 2) knowledge of accounting principles; 3) ability to plan, organize and resolve problems; 4) ability to communicate in writing; and 5) knowledge of government contract law, regulations and policies. See Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment, Ex. A, Ex. 1. The applicants were required to address in writing, on plain white paper, how their prior experience fulfills each of the KSA's. Id. This was to enable the evaluators to determine how the applicant's education and training related to job qualifications for the Contract Specialist Series. Id.

[9] Id.

[10] Id.

[11] Memorandum in Opposition to Defendant's Motion for Summary Judgment (doc. no. 41) at 2.

submit a performance appraisal.[12]  Her submission was evaluated by Ms. Heidi Huckaby (now Gerstner), a Defense Contract Management District East personnel specialist located in Boston, Massachusetts.[13]  Ms. Gerstner evaluated a total of twelve applications, including plaintiff's, and found six of the applicants qualified for the position.[14]  Bullock was found not qualified, because she was deemed to lack the requisite one year of specialized experience in contract administration at the GS-05 level.[15]

Bullock's form 171, submitted as part of her application, details her work experience.[16]  She began working for the Defense Logistics Agency in 1984.[17]  In block F of the form, Bullock represented that she had worked as a Procurement Clerk and Computer Assistant, GS-1106-04 and GS-0335-05, until September 1, 1987.[18]

---

[12] Id.

[13] Memorandum in Support of Defendant's Motion for Summary Judgment (doc. no. 33) at 1.

[14] Id. at 2.  Two applicants, including plaintiff, were found not qualified because they lacked specialized experience.  Two were found not qualified because they did not meet the Defense Acquisition Workforce Improvement Act (DAWIA) educational requirements.  The other two were found not qualified because they were outside the area of consideration.  Id.

[15] Memorandum in Opposition to Defendants Motion for Summary Judgment at 2.

[16] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (doc. no. 36), Ex. A, Ex. 2.

[17] Id.

[18] Id. at 5.  According to the record, Bullock actually began working as a Flight Operations Clerk (Typing), GS-303-04, in December, 1984.  Id., Ex. 3. She was promoted to Procurement Clerk (Typing), GS-1106-04, in July 1985.  Id.,

Therein she described her duties:

> As a Procurement Clerk, I manually documented each Over
> & Above work requests [sic] on each aircraft.  The total
> cost was calculated by a hand calculator.  Once the
> automated system was implemented, more information was
> available in real time such as total dollars spent,
> manhours saved, and the check on the duplication of work.
> The automated sysstem [sic] was cost effective.[19]

She also described her duties as a GS-0335-05 Computer Assistant:

> I was independently responsible for all tasks required to
> set up and operate the computer and its associated
> peripherals for Contracts/Production functions. When it
> was necessary I added new program capabilities to
> computer systems.  I prepared Management Information
> Reports, Management Charts and Graphs, and Over & Above
> historical data.  I assisted in the program design,
> development, and implementation of the over and above
> automation system.  I trained clerical personnel in the
> operation of the computer.[20]

Bullock's application is unclear as to the date on which she ceased
her duties as a Procurement Clerk and began working as a Computer
Assistant.[21]

Bullock described her employment experience from September
1987 to March 1989 in block D.[22]  She again characterized her
positions as "Procurement Clerk and Computer Assistant," GS-1106-04

---

Ex. 4.  She was then promoted to Computer Assistant, GS-335-05, in July, 1986.
*Id.*, Ex. 6.

[19] *Id.*, Ex. 2 at 5.

[20] *Id.*

[21] *See supra* note 19.

[22] There was no "block E" on the form submitted to the court.

8

and GS-335-05,[23] and described her duties as follows:

> I was independently responsible for all tasks required to
> set up and operate the computer and its associated
> peripherals for Contracts/Production functions.  I was
> responsible for input of data from functional specialist.
> I reviewed data for completeness and accuracy before
> input.  I prepared monthly/recurring data summaries from
> inputted data, by loading programs and making appropiate
> [sic] computer settings to activate processing of data
> and printing of output in final report.  I researched
> technical computer equipment manuals for methods of
> improvement/modification of existing databases.  I added
> new program capabilities to computer systems and make
> [sic] provisions in structure and memory for storing
> new/additional databases and worked with DCASR Atlanta
> programmers to modify procedures.  I assisted in program
> design, developed, and implemented various computer
> programs.  I prepared and distributed Management
> Information Reports, Management Charts/Graphs/Over &
> Above historical data.  I trained other personnel in the
> use of enable wordprocessing, spreadsheet, and
> database.[24]

Thereafter, Bullock's duties were computer-related or
secretarial.  She described her employment beginning in March,
1989, and continuing through November, 1993, as "Computer
Assistant," GS-355-05.  She defined this position as
"administrative support for the Branch Chief."[25]  Between November

---

[23] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion
for Summary Judgment (doc. no. 36), Ex. A, Ex. 2.  Bullock actually was only a
Computer Assistant during this time. *See supra* note 19.

[24] Plaintiff's Supplemental Evidentiary Submission in Opposition to
Defendant's Motion for Summary Judgment (doc. no. 40), Ex. U, Ex. 38.

[25] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion
for Summary Judgment (doc. no. 36), Ex. A, Ex. 2 at 4.  She stated that her
responsibilities were:

Gathering and compiling data for the NASA Status Report.  Collecting

1993 and November 1996, Bullock was a "Management Assistant," GS-344-05/07.   In this position she "served as an administrative support for the Branch Chief and two Section Chiefs."[26]

Bullock held her job as secretary from November of 1996 until the date this action was instigated.  Her position was "Secretary," GS-0318-05/08, which included "perform[ing] Secretarial duties for the Chief of the Huntsville NASA Area Team in Huntsville, AL."[27]

---

and reporting reimbursable hours to the AO.   Timekeeper for Associates at Boeing, USBI, and the Yellow Creek Facility. Maintained a continuous inventory of QAR inspection stamps. Provided statistical data for Management Charts.  Maintained a log for Procurement Data Package Deficiency.   Prepared mission and training request including estimating travel cost.    Prepared personnel action request (PAR). Consolidated Management Information Systems data and entered into the MIS system.   Trained QARs in DOS and Enable Wordprocessing, Spreadsheet, Graphics, and Database. Maintained a continuous inventory of QAR inspectioin stamps. Maintained computer inventory databases. Updated local personnel 7b files.   Focal point for Email system.

Id.

[26] Id. at 3.  Plaintiff said her responsibilities were:

Time and Attendance.   Compiled data and submitted the Return on investment Reports.   Credit card purchases for the branch Office. Prepared mission and training request including calculating the cost. Downloaded, edited, and uploaded Pre-Award surveys.  Prepared personnel action request (PARS).  Maintained a continuous [sic] inventory of QAR inspection stamps.  Maintained computer inventory database.   Updated local personnel files.   Provided assistance to Branch personnel in the use of computer systems.   Distributed the mail.

Id.

[27] Id.  Her responsibilities included:

Estimating travel cost in preparation of travel orders and training request. Manpower time charges such as collecting, consolidating, and reporting NASA reimbursable time.   Maintains a record of reimbursable time for the NASA Status Report.   Established and Maintains a database of Family Sick hours used.  Maintains a log of

10

Bullock received notification that she had been found "not qualified" on January 9, 1997.[28]   She called the personnel department on January 24th, explaining that she did not believe they had given her enough credit for her work experience as a Computer Assistant.[29]   Bullock subsequently wrote a letter to Gerstner (Huckaby) on January 25, 1997, detailing how her job experience met the specialized experience requirement.[30]  On January 31st, she spoke by telephone with Gerstner's supervisor in Boston, Patricia Blakely, and asked permission to supplement her

---

Overtime used and reports overtime to B'ham Management on a weekly basis.  Timekeeper for GLNE.  Reporting of MIS data into the MOCAS System for Quality Assurance Specialists Maintains inventory record of QA Stamps.   Orders Office Supplies, Safety Equipment, and controls penalty stamps.  Monitor for Eye Exams.  Distribution of Mail.

*Id.*

[28] *Id.*, Ex. A at 103.

[29] *Id.*, Ex. A, Ex. 15.

[30] *See* Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (doc. no. 36) , Ex. A, Ex. 8 at Bullock 32.  She explained:

I feel the confusion came about because of the job series.  In 1986, I was assigned from the Flight Line Clerk position to a Procurement Clerk GS-1106-04 to work with the automated Over & Above program.   In order to upgrade the position, my job series was changed to a Computer Assistant series and I was Promoted to GS-05 in July 1986.   In September 1987, I was transferred to the Greenville, MS, facility.  I worked in Greenville in the same area of production/contracts for approximately two years.  I have more than three years experience working as a GS-05 level in production/contracts.

*Id.*

11

application.[31]  Bullock then sent additional material to Blakely,
including examples of work she had performed in the past.[32]  Blakely
reviewed the additional material, but concluded that it did not
show any evidence of contracting work or other specialized
experience with contract administration.[33]  Blakely explained her
decision in a letter to Bullock, dated February 19, 1997:

> [A] thorough review was made of the originally submitted
> application for JOA 59A-97.  Included was the review of
> responses to the KSAs and the description of duties
> performed.  I have determined that your application lacks
> the evidence of specialized experience directly in or
> related to the 1102 series.
>
> The Computer Assistant, GS-335-5, position you refer to
> in your letter as the position that was not given enough
> credit while working in Production/Contracts was again
> reviewed.  The Computer Assistant, GS-335-5, position
> that you held from July 13, 1986 to March 5, 1989,
> specifically described only computer related duties.[34]

Only the names of qualified applicants were submitted to the
Birmingham Defense Contract Management Command on the Referral &
Selection Certificate.[35]  The list did not include Bullock.  The
selecting official was Willie Campbell, GS-1101-13, Area Chief of

---

[31] Memorandum in Support of Defendant's Motion for Summary Judgment (doc. no. 33) at 3.

[32] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment, Ex. A at 101.

[33] Declaration of Pat A. Blakely (doc. no. 31) at 1, 2.

[34] *Id.*, Ex. A.

[35] *See* Memorandum in Support of Defendant's Motion for Summary Judgment at 7.

the Huntsville NASA team.[36]   Campbell selected the three interviewers for the interview panel.  Ultimately, only three of the qualified applicants were still interested in the job, and they were all hired after being interviewed.[37]  Each of the selected applicants, Catherine Moore, Barry Williams, and Joyce Hicks, was substantially younger than Bullock.  Catherine Moore was 36 years old, Joyce Hicks was 30, and Barry Williams was 37.[38]

On March 14, 1997, Bullock attended a meeting at which she heard Colonel William Pulscher, the Commander of the Defense Contract Management Command in Birmingham, make "multiple ageist comments."[39]  In response to a question about the selection criteria for upward mobility positions, Col. Pulscher said:

> The criteria right up front for creating the upward mobility positions was to bring in younger people to replace the aging workforce.  That is just the way it is, folks.  We cannot make everybody happy.  We only have eighteen people under the age of thirty in the whole Birmingham area.[40]

Pulscher subsequently admitted that he may have used terms such as

---

[36] Plaintiff's Supplemental Evidentiary Submission In Opposition to Defendant's Motion for Summary Judgment, Exhibit S (Affidavit of Willie F. Campbell).

[37] Memorandum in Support of Defendant's Motion for Summary Judgment at 7,8.

[38] Memorandum in Opposition to Defendant's Motion for Summary Judgment (doc. no. 41) at 8.

[39] *Id.* at 8,9.

[40] *Id.*

"graying of the work force."[41]   A Contract Administrator, Jerry Tucker, said that he attended several Commanders Conferences during that period at which there were discussions concerning the "graying of the workforce"; the "workforce getting older"; and the fact that there was a need to hire or promote younger people.[42]  At least ten others heard such statements by Col. Pulscher.[43]

Bullock filed a formal administrative complaint of age discrimination on April 15, 1997.[44]  She was informed by the Equal Employment Opportunity agency of her right to sue on November 5, 1998.[45]  She instituted this action on February 2, 1999.

### III. DISCUSSION

To prevail on a failure to promote claim under the ADEA, a plaintiff must prove that her employer intentionally refused to promote her because of her age.  *See* 29 U.S.C. § 623(a).  The plaintiff has the ultimate burden of proving that age was a determinative factor in her employer's failure to promote her. *See, e.g., Verbraeken v. Westinghouse Electric Corporation*, 881 F.2d 1041, 1045 (11th Cir. 1989), *cert. dismissed*, 493 U.S. 1064,

---

[41] *Id.* at 9.

[42] *Id.*

[43] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment, Ex. C, Exs. 8-17.

[44] Complaint ¶ 10.

[45] *Id.* ¶ 7.

14

110 S.Ct. 884, 107 L.Ed.2d 1012 (1990).  There are three methods by which a plaintiff may prove age discrimination: "by direct evidence of discriminatory intent; by meeting the test originally set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); or by statistical proof of a pattern of discrimination." *Verbraeken,* 881 F.2d at 1045; *see also*, *e.g.*, *Alphin v. Sears, Roebuck & Company*, 940 F.2d 1497, 1500 (11th Cir. 1991); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987).  Because plaintiff has offered no statistical evidence, the court will examine her claims according to the direct evidence and circumstantial evidence frameworks.  The characterization of evidence as either direct or circumstantial determines the applicable analytical paradigm.

**A.   Direct Evidence**

Direct evidence is evidence that, if believed, proves the existence of a fact in issue without the need of an inference or a presumption.  *See, e.g., Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require ... an inferential leap between fact and conclusion."); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (defining direct evidence as

15

"evidence, which if believed, proves existence of fact in issue without inference or presumption"). Eleventh Circuit precedent establishes that "direct evidence is composed of 'only the most blatant remarks, whose intent could be nothing other than to discriminate' on the basis of some impermissible factor." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)).

The characterization of evidence as direct "dramatically affects the allocation of the evidentiary burdens." *Carter,* 132 F.3d at 641. When a plaintiff establishes by direct evidence that a contested employment decision was motivated by a discriminatory animus, the employer "may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender [or age] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (emphasis supplied)[46]; *see also, e.g., Carter*, 132 F.3d at 641; *Haynes v. W.C.*

_____

[46] The Supreme Court also held with respect to such evidence that, once a plaintiff "shows that gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role." *Price Waterhouse*, 490 U.S. at 244-45, 109 S.Ct. at 1787-88. Justice O'Connor's concurring opinion in *Price Waterhouse* is to the same effect: "Once a Title VII plaintiff has demonstrated by direct evidence that discriminatory animus played a significant or substantial role in the employment decision, the burden shifts

*Caye and Company, Inc.*, 52 F.3d 928, 931 & n.8 (11th Cir. 1995). "When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453 (11th Cir. 1996) (citing *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Haynes*, 52 F.3d at 931. "By producing direct evidence, the plaintiff effectively shifts the burden of proof to the defendant, who must then show that there was no discrimination. It is rare that direct evidence of discrimination exists, however." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987).[47]

## 1.   Ambiguous statements and statements of non-decisionmakers

Statements of decisionmakers directly linked to the decisions

---

to the employer to show that the decision would have been the same absent discrimination." *Id.* at 276, 109 S.Ct. 1804 (O'Connor, J., concurring).

[47] *See also, e.g.*, Brown v. American Honda Motor Co., Inc., 939 F.2d 946, 950 (11th Cir. 1991) (§ 1981 case noting that, "seldom is there direct evidence of intentional racial discrimination"); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1981) (stating that *McDonnell Douglas* test is designed to ease burdens on discrimination plaintiffs when direct evidence of discrimination is lacking); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 11184 (11th Cir. 1984) ("Because direct evidence of discriminatory animus can be difficult to produce, it is often appropriate to analyze circumstantial evidence of discrimination according to the three-step procedure first developed in *McDonnell Douglas Corp. v. Green*, ....").

resulting in a failure to promote an employee constitute direct evidence of discrimination. *See, e.g., Trotter,* 91 F.3d at 1453 ("Statements indicating ... bias on the part of a decisionmaker in an employment setting can constitute direct evidence of ... discrimination in Title VII cases.") (citations omitted); *Thompkins v. Morris Brown College*, 752 F.2d 558, 561, 563-64 (11th Cir. 1985) (statement by decisionmaker that he saw no need for a woman to have a second job constituted direct evidence of discriminatory intent).

On the other hand, statements that do "not relate directly to the decision" in dispute, or "statements that are open to more than one interpretation do not constitute direct evidence of ... discrimination." *Carter*, 132 F.3d at 642; *see also Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996) (statements that could "have more than one possible meaning" are not direct evidence of discrimination). This includes "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804-05 (O'Connor, J., concurring). Such statements do not "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Id*. An instructive

18

case is *Hunter v. Allis-Chalmers Corporation*, 797 F.2d 1417 (7th Cir. 1986), in which the Seventh Circuit commented upon the relevance and probative value of stray remarks by nonsupervisory employees.

> [A] company certainly is not liable for every racial slur by a nonsupervisory member of its work force. ... Not only is it hard to see how an isolated racial slur could be thought a significant enough event to count as employment discrimination; it is unclear what practical steps an employer could take to purge all racially offensive speech from the workplace.

*Id.* at 1421 (Posner, J.) (citations omitted).  Thus, "[o]nly the most blatant remarks, whose intent could only be to discriminate on the basis of [an impermissible factor] constitute direct evidence." *Coats v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1992). Evidence merely suggesting discrimination is not sufficient.

### 2.   Hearsay - statements made by a third party

Evidence of a person's extrajudicial statements is admissible under Rule 803(3) of the Federal Rules of Evidence as an indication of the declarant's then existing state of mind.

> **Rule 803.  Hearsay Exceptions; Availability of Declarant Immaterial**
>
> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> ...

19

> **(3) Then existing mental, emotional, or physical
> condition.—** A statement of the declarant's then existing
> state of mind, emotion, sensation, or physical condition
> (such as intent, plan, motive, design, mental feeling,
> pain, and bodily health), but not including a statement
> of memory or belief to prove the fact remembered or
> believed unless it relates to the execution, revocation,
> identification, or terms of [the] declarant's will.

Moreover, a person's out-of-court declaration of his state of mind
may be admissible, not only as proof of the person's state of mind
at the time the statement was made, but also to show the
probability that he committed some subsequent act pursuant to that
declared state of mind.[48]

---

[48] For example, in Bell v. Crackin Good Bakers, Inc., 777 F.2d 1497 (11th
Cir. 1985), the Eleventh Circuit held that the statement of a person who later
became the supervisor of a female plaintiff — to the effect that, "if it were
left up to him, he would have no women in the plant at all because men were
better able to perform all the functions required in its operation" — provided
a means of interpreting what that same person really meant on a later date when,
in his capacity of supervisor, he uttered more ambiguous statements.

> For a person who became the supervisor over the petitioner to have
> said at an earlier time that if it was left up to him, he [Harvey
> Powell] would have no women in the plant at all because men were
> better able to perform all of the functions required in its
> operation, and who had said to the person who took the petitioner's
> job after she was allegedly forced out, he should not fret, that he
> should stay cool, that "we could get rid of her and we could make it
> rough enough on her for her to leave," it approaches the frivolous
> to contend that there was no evidence of sexual discrimination.
> This was direct evidence that she was constructively fired from her
> job by the improper harassment by Powell, because she was a woman.
>         . . .
> Referring again to the harassment issue as to which we noted
> there was direct evidence of discriminatory intent, we recognize
> that the statement made by Powell with respect to women employees
> was made some time before he became petitioner's supervisor in the
> plant.    However, we are not dealing with his discriminatory
> expressions while exercising his functions as a supervisor.    We are
> dealing with them rather as an illumination or explanation of what
> he meant when he made the comment:   "We could get rid of her.   We

Even so, the extrajudicial statements of a declarant as to his then existing state of mind cannot be used to implicate, or reflect upon the probable conduct of a third person. *See United States v. Cintolo*, 818 F.2d 980, 1001 (1st Cir.), *cert. denied*, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987); *Holifield v. Reno*, 115 F.3d 1555, 1563-1564 (11th Cir. 1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.") (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir. 1990)); see *also* H.R. Rep. No. 650, 93d Cong., 1st Sess. (1973) ("[T]he Committee intends that [Rule 803(3)] be construed ... so as to render statements of intent by a declarant admissible <u>only</u> to prove <u>his</u> future conduct, <u>not the future conduct of another person</u>."), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7057, 7087 (emphasis supplied).

Cases holding that evidence of racial or ethnic bias by non-decisionmakers is not probative of the decisionmaker's intention, especially when the evidence of bigotry was unknown to the actual

---

could make it rough enough for her to leave, " after he became supervisor and was authorized by his superiors to harass the petitioner so that she would quit her job.  A factfinder could clearly infer from his previous statements what he meant when he carrier on as he did after he became supervisor.

*Id.* at 1501 (Tuttle, J.).

decisionmakers, include the following: *Hong v. Children's Memorial Hospital,* 993 F.2d 1257, 1266 (7th Cir. 1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994) (finding evidence of supervisor's occasional use of slurs directed at plaintiff's national origin, when unrelated to the decisional process, insufficient to demonstrate that the employer relied on illegitimate criteria); *Cesaro v. Lakeville Community School District,* 953 F.2d 252, 254 (6th Cir. 1992), *cert. denied,* 506 U.S. 867, 113 S.Ct. 195, 121 L.Ed.2d 138 (1992) (ruling that superintendent's motivation is not "relevant inquiry" where school board did not rely on gender as a factor in its hiring decision); *Williams v. Mead Coated Board,* 836 F. Supp. 1552 (M.D. Ala. 1993), *aff'd,* 413 F.3d 668 (11th Cir. 1994) (finding no credible credible evidence that "any racially derogatory remarks [were] ... 'related to the selection of an employee for a particular promotion'") (citations omitted).

### 3. Colonel Pulscher's statements

With the foregoing principles as a basis for decision, this court concludes that Coloner Pulscher's statements do <u>not</u> constitute direct evidence because: 1) they are ambiguous; 2) there is no evidence that Pulscher was part of the decisional process

that identified and referred qualified candidates; and 3) statements evincing Pulscher's state of mind are not probative of the actions of the third party decisionmakers, Gerstner and Blakely.

Colonel Pulscher's statements referring to the aging workforce are ambiguous. Pulscher may have been voicing a discriminatory bias related to age. On the other hand, he may have been attempting to convey a legitimate concern, that his agency would be unable to fulfill its mission in the future. He later explained the comments:

> As the Commander of DCMC Birmingham I have repeatedly said to our entire workforce in numerous All Hand sessions and in every team meeting I have attended, that I am concerned about preserving our core competencies so this unit can effectively do its mission in the 21st century. In these briefings I explain that the concern is compounded by the fact that the unit has not had an intern or trainee program to bring replacements into the workforce in some job series and specialties in the past 5 or more years. I have also said that it is even more critical when vied form [sic] the perspective that a great percentage of our workforce is either retirement eligible or will be retirement eligible in the next few years. This topic has been addressed in all the DCMC Commanders conferences I have attended, and on occasion in meetings where I have spoken to my employees, I have used figures that I heard presented at these conferences.[49]

Even if Pulscher's statements were sufficiently "blatant,"

---

[49] Plaintiff's Supplemental Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (doc. no. 40), Ex. T.

they still are not direct evidence of age discrimination because he was not part of the decisionmaking process.  The decisionmakers in this case were Heidi Gerstner, Patricia Blakely, and Willie Campbell.  Gerstner made the initial determination that Bullock was not qualified.  Subsequently, upon reviewing Bullock's application, Blakely, Gerstner's supervisor, made the same determination. Bullock's name was not submitted to the selecting official, Willie Campbell, and she was, therefore, not considered for the position.

Despite the fact that Pulscher was not a decisionmaker, Bullock contends that Colonel Pulscher's comments are indicative of an "agency-wide age discriminatory atmosphere."[50]  As evidence of this Bullock points to the following: 1) a meeting held in San Diego which dealt with the aging of the workforce; 2) the creation of upward mobility positions; and 3) Colonel Pulscher's statements at the March 14, 1997, staff meeting.

Major General Drews, the Commander of the DCMC, presided over the San Diego meeting.[51]  All Commanders were required to attend, including Colonel Pulscher and Colonel McKinley, the District East Commander in charge of Gerstner and Blakely in Boston.  After that meeting Colonel Pulscher told Frank Barrientes, the Deputy

---

[50] Memorandum in Opposition to Defendant's Motion for Summary Judgment (doc. no. 41) at 6.

[51] *Id.*

Commander of DCMC Birmingham, that a presentation was made on the aging of the workforce.[52]  Pulscher described the presentation as voicing "concerns about our work force from the perspective when you looked to the future five and ten and twenty years out, most or the greatest percentage of our workforce was at an age where they were retirement eligible.  So you had the concern which they were trying to articulate that we need to try and develop a program to ensure that as our workforce retires and leaves we will have the expertise and the core competency to do the job in the future."[53]

Bullock, nevertheless, has produced no evidence linking this assertion of an agency wide atmosphere of age bias with the specific individuals who had power over her employment prospects. Bullock admitted that Col. Pulscher had no influence over the decision:

> Q.  [B]ut do you know of any evidence that indicates that Colonel Pulscher was involved personally in the decision finding you not eligible for these positions?
>
> A.   I think it was an agency wide concerted effort to hire in younger people in these positions.
>
> Q.   So my question is: Do you know of any evidence, any documents, any testimony from witnesses indicating that Colonel William Pulscher had some influence or involvement in finding that you were not eligible for

---

[52] Id.

[53] Memorandum in Opposition to Defendant's Motion for Summary Judgment at 7 (quoting Pulscher's deposition at 23).

these positions?

A.   No.   That was a personnel specialist.

Q.   So you don't have any evidence that Colonel Pulscher
was involved in that determination?

A.   No direct evidence.

Q.   How about indirect evidence?

A.   No.[54]

Moreover, Bullock has not produced evidence indicating that Col.

McKinley, the Commander over Gerstner and Blakely in Boston, held

discriminatory views.  Gerstner denied hearing such statements from

higher officials:

Q.   After you went to work for DCMC in '94, have you
ever heard any people in the command refer to the age of
the work force or the greying of the work force or terms
of that nature?

A.   No.

Q.   You have not?

A.   No.

Q.   Have you ever heard anyone express any concern that
so many percentage of people are over the age of 50 in
the DCMC work force?

A.   I certainly don't recall anything like that, no.

Q.   Or that there were a certain percentage of people
who would be retirement eligible in the DCMC?

---

[54] Memorandum in Support of Defendant's Motion for Summary Judgment (doc.
no. 33) at 11.

A.   No.

Q.   Have you heard anyone talk about due to the age of
the work force that DCMC might lose its Knowledge base or
competencies, however you want to phrase that?

A.   No.

Q.   Or due to the retirement eligibility of the work
force, that competencies or the knowledge base would be
compromised?

A.   No. [55]

Bullock has further failed to produce evidence that the
selecting official, Willie Campbell, was tainted by an "agency wide
atmosphere of age discrimination."   Campbell attended the March
meeting with Pulscher.  Campbell described his impression of the
statements at the meeting:  "I did not here [sic] the statement
that these positions would be for younger employees only.   I
remember him encouraging ALL DCMC employees that are eligible to
apply for these position(s)."[56]  Campbell denied being instructed
to hire workers of a certain age:  "At no time were [sic] I
directed by anyone in my uppermanagement chain on who to hire;
race, age, or etc. ... The selections were made after a through
[sic]  review  of  each  candidate's  application  package  and

[55] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion
for Summary Judgment (doc. no. 36), Ex. D. at 39-40.

[56] Plaintiff's Supplemental Evidentiary Submission in Opposition to
Defendant's Motion for Summary Judgment (doc. no. 40), Ex. S.

27

observation of the panel interviews."[57]   Furthermore, and most telling, is the fact that it was Willie Campbell who encouraged Bullock to apply for the position in issue.[58]

Ultimately, the inquiry must focus upon Gerstner and Blakely, the personnel specialists in Boston who made the decision that Bullock was not qualified for the Contract Administrator position. Willie Campbell selected the candidates for the promotion from a list supplied by Gerstner.  Bullock was not on that list.  Because there is no reason to impute Col. Pulscher's statements to either Gerstner or Blakely or their respective decisions, the court finds that Col. Pulscher's comments are not direct evidence of age discrimination.

Indeed, Pulscher's statements are not admissible to prove the state of mind of third parties:  in this case, the actual decisonmakers, Gerstner, Blakely, and Campbell.  Bullock has not produced any evidence that Gerstner, Blakely or Campbell themselves made discriminatory statements or engaged in discriminatory acts. Under Rule 803, Bullock cannot use Colonel Pulscher's statements to prove the intent of the third party decisionmakers or acts in accordance therewith.

---

[57] *Id.*

[58] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment (doc. no. 36) at 111.

**B.   Circumstantial Evidence**

Because Bullock has failed to produce direct evidence of age discrimination, the court will examine her claims under the paradigm developed for circumstantial evidence.

To avoid summary judgment on an age discrimination claim, a plaintiff relying on circumstantial evidence must comply with the framework created for the evaluation of a plaintiff's proof of an employer's intention to discriminate in the context of Title VII disparate treatment claims.   That framework was defined by the Supreme Court in a series of three decisions rendered over a period of two decades, beginning with *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).   Although these cases involved discrimination claims under Title VII, a variant of the analysis also applies to claims based upon the ADEA.   *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (assuming that *McDonnell Douglas* analytical framework applies to ADEA claims based on circumstantial

29

evidence); *Bogle v. Orange County Board of County Commissioners*,
162 F.3d 653, 656 (11th Cir. 1998) ("Since Bogle has presented no
direct evidence that Orange County discharged him because of his
age and relied, instead, on circumstantial evidence, the burden-
shifting analysis set forth in *McDonnell Douglas Corp. v. Green*,
..., governs his ADEA case."); *Turlington v. Atlanta Gas Light Co.*,
135 F.3d 1428, 1432 (11th Cir. 1998) (applying *McDonnell Douglas*
framework in an ADEA case); *Mitchell v. Worldwide Underwriters Ins.
Co.*, 967 F.2d 565, 566 (11th Cir. 1992) (same); *Alphin v. Sears,
Roebuck & Co.*, 940 F.2d 1497, 1500 (11th Cir. 1991) (same); *Rollins
v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir. 1987) ("This
court applies a slightly modified version of the test set forth in
*McDonnell Douglas Corp. v. Green*" when evaluating the strength of
circumstantial evidence to prove a prima facie case of age
discrimination.).

The analytical framework developed by *McDonnell Douglas* and
its progeny has three steps.  In all cases arising under the ADEA
in which the plaintiff seeks to prove age discrimination by means
of circumstantial evidence, the plaintiff bears the initial burden
of establishing a prima facie case.  *Clark v. Coats & Clark, Inc.*,
990 F.2d 1217 (11th Cir. 1993); *Young v. General Foods Corp.*, 840

30

F.2d 825 (11th Cir. 1988).  "If a plaintiff establishes a prima facie case ... the employer must articulate a legitimate, nondiscriminatory rationale for the [contested employment action]. If the employer does so, the burden shifts back to the plaintiff to prove that the employer's asserted reason is pretextual." *Young*, 840 F.2d at 828.  The goal of the three-step process is that of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Hicks*, 509 U.S. at 506, 113 S.Ct. at 2746 (*quoting Burdine*, 450 U.S. at 255 n.8, 101 S.Ct. at 1094 n.8).

### 1.   Prima Facie Case

A plaintiff with circumstantial evidence of age discrimination can establish a prima facie ADEA case if she can prove:  1) she is a member of the protected group of persons between the ages of forty and seventy; 2) she was subjected to an adverse employment action, (*i.e.*, failure to promote); 3) the position was filled by a substantially younger person; and 4) she was qualified for the position. *See. e.g.*, *Reeves v. Sanderson Plumbing Products, Inc.*, __ U.S. __, 120 S.Ct. 2097, 2101, 147 L.Ed.2d. 105 (2000); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998).

Bullock was almost 57 years old on the date she was determined to be unqualified for promotion to the position of Contract Administrator. The employees selected were substantially younger, and also below the statutorily protected threshold age of forty. The Contract Administrator trainee position was a GS-07 position with promotion potential to GS-11, and Bullock was working at the GS-05 level. Therefore, there is no question about the fact that Bullock has established the first three elements.

### 2. Requirement that employee be qualified

The dispositive element here is the fourth: whether Bullock was qualified for the position. "[S]ummary judgment is appropriate against a plaintiff who fails to demonstrate that [s]he was qualified to perform the position for which [s]he was rejected." *Turlington*, 135 F.3d at 1433. A plaintiff is qualified for a position if she fits the criteria the employer has specified for the position. *See Wright v. Southland* Corp., 187 F.3d 1287, 1301 n. 16 (11th Cir. 1999) (citing *Thornley v. Penton Publishing, Inc.*, 104 F.3d 26 (2nd. Cir. 1997)).

### a.   Required experience

To qualify for a position as a Contract Specialist, GS-1102-07, an applicant must demonstrate one of two things: 1) one full year of graduate or law school education, or superior academic

32

achievement in undergraduate education; or 2) one year of specialized experience at the GS-05 level.[59] The U.S. Office of Personnel Management Qualification Standards Operating Manual for the Contracting Series position lists examples of "specialized experience":

> Developing, preparing, and presenting terms and conditions in bids or proposals related to the award of contracts.
>
> Negotiating and awarding contracts, contract modifications, and/or subcontracts.
>
> Legal practice involving participation in negotiating, awarding, or administering contracts, or the analysis of procurement policies and procedures.
>
> Administering the terms and conditions of contracts, including such aspects as preparing contract modifications, evaluating economic factors, estimating production efficiencies, and evaluating methods of allocating costs through various types of overhead and general and administrative expense.
>
> Analyzing proposed prices or costs, including such aspects as evaluating technical and audit reports, forecasting price trends, evaluating economic factors, estimating production efficiencies, and evaluating methods of allocating costs through various types of overhead and general and administrative expense.
>
> Formulating policies and procedures for the acquisition of goods or services, participating in procurement management reviews and contract clearance, or developing positions on claims and protests related to

---

[59] Plaintiff's Evidentiary Submission in Opposition to defendant's Motion for Summary Judgment (doc. no. 36), Ex. A, Ex. 8 at Bullock 52.

contracts. [60]

>    **b.    Bullock's application**

Bullock posits that her application demonstrates specialized experience in contract administration.    She points to the description of her experience contained on her form 171:

> As a Procurement Clerk, I manually documented each Over & Above work requests [sic] on each aircraft. ...
>
> I prepared Management Information Reports, Management Charts and Graphs, and Over & Above Historical Data.  I assisted in the program design, development, and implementation of the over and above automation system. [61]

Bullock also points to her answer to KSA #1, the ability to perform price/cost analysis, as evidence of specialized experience:

> I was responsible for inputting and managing a database of Over & Above work requests at an aircraft overhaul facility.  On a biweekly basis, I prepared charts/graphs of the status of each aircraft in work and faxed the information to the Atlanta APMA office. I performed evaluations on cost proposals for definitizing of Over & Above work efforts.   I provided a report to management which indicated the total dollars spent, the man-hours saved, and a tracking of the duplication of work requests for each Air Force C9 overhaul and each Navy A6 intruder aircraft rewing. [62]

> Bullock also alleges that her qualifications are identical to

---

[60]   *Id.*

[61] Memorandum in Opposition to Defendant's Motion for Summary Judgment at 3, 4.

[62] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment Ex. A, Ex. 2; Memorandum in Opposition to Defendant's Motion for Summary Judgment at 4.

those of Joyce Hicks, a candidate who was selected for the
position. When she applied for the job, Hicks had been working as
a Procurement Clerk, GS-05, for three years.[63] Bullock also worked
as a Procurement Clerk, but at the GS-04 level. Bullock's position
description from her Official Personnel File describes her duties
as a Procurement Clerk, GS-1106-04. For example, "[i]ncumbent
performs contract administration clerical services involving the
review, analysis and processing of contractual documents received
for administration. ..."[64] The position description also describes
the knowledge required for the position: "Skill in interpreting
contracts, regulations and/or reports in accordance therewith."[65]

Upon closer inspection of her application, however, it is
clear that Bullock failed to adequately document her employment
history and failed to adequately establish specialized experience
in contract administration. Gerstner and Blakely cannot be faulted
for these deficiencies.

Bullock's application is confusing, misleading, and rife with
inconsistencies. In blocks F and D, she provided the wrong series
designations for the positions she had held. She also provided

---

[63] Memorandum in Support of Defendant's Motion for Summary Judgment (doc. no. 33), Ex. A.

[64] Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment, Ex. A, Ex. 5 at 2.

[65] *Id.* at 3.

incorrect titles for these positions.  In block F of her form 171,

Bullock describes her employment from December 1, 1984 to September

1, 1987.  Block D calls for the "Exact title of your job."[66]  She

states  her  "[e]xact"  job  titles  were  "Procurement  Clerk  and

Computer Assistant," with the correlating job series, "GS-1106-04

and GS-0335-05."[67]  Bullock describes her employment from September

3, 1987 to March 5, 1989, in block D.  She provided the titles

"Procurement Clerk and Computer Assistant," with these correlating

series designations: "GS-1106-04 and GS-0335-05."[68]  Records from

her  Official  Personnel  File  tell  a  different  story.   Bullock

actually began working as a Flight Operations Clerk (Typing), GS-

303-04, in December of 1984.[69]  She was promoted to Procurement

Clerk (Typing), GS-1106-04, in July of 1985.[70]  She was then

promoted to Computer Assistant, GS-335-05, in July of 1986.[71]  She

acknowledged and explained the inconsistency in her deposition:

> Q:   My question is:  In block (D) on page 4 of Exhibit
> 2 when listing the exact title of your job in Greenville,
> Mississippi  you  put  Procurement  Clerk  and  Computer
> Assistant, didn't you?

---

[66] *Id.*, Ex. 2 at 4.

[67] *Id.* at 5.

[68] *Id.*

[69] *Id.*, Ex. 3.

[70] *Id.*, Ex. 4.

[71] *Id.*, Ex. 6.

A:    That was a typo.

Q:    What should have been you title there?

A:    Computer Assistant.

Q:    And that would have been the GS-335-5; correct?

A:    Yes.[72]

Moreover, it is impossible to determine from her answer in blocks D and F which duties she performed as a Procurement Clerk and which duties she performed as a Computer Assistant.   Bullock addressed the ambiguity:

> Q:   You began the paragraph with the phrase, and I'm going to quote, "As a Procurement Clerk," and then you continued; correct?
>
> A:   Right.
>
> Q:   And then in you second paragraph on that same block, block (F), you didn't make a reference initially as to which position you were referring to, did you?
>
> A:   No.[73]

Bullock's application also fails to document the required one year of specialized experience in contract administration at the GS-05 level or above.   Bullock worked as a Procurement Clerk, job series 1106, but only at the GS-04 level.   All of her duties at the GS-05 level were computer related or secretarial.   Bullock admitted

---

[72] *Id.*, Ex. A at 84.

[73] *Id.* at 29.

that she did not have significant specialized experience matching the examples given in the U.S. Office of Personnel Management Qualification Standards Operating Manual for the Contracting Series.  She did not have experience in: 1) developing, preparing and presenting the terms and conditions in bids or proposals related to the award of contracts; 2) negotiating and awarding contracts; 3) contract modifications; 4) subcontracts; 5) legal practice involving contracts or procurement policies; 6) contract termination; or 7) formulating policies and procedures for the acquisitions of goods or services, participating in procurement management reviews and contract clearance, or developing positions on claims and protests related to contracts.[74]  The only evidence of specialized experience in contract administration that Bullock offered was in paragraph three of her answer to KSA #1, the ability to perform price/cost analysis.  She wrote, in pertinent part: "I performed evaluations on cost proposals for definitizing of Over & Above work efforts."[75]  She argues that this experience involved the evaluation of performance under contracts and analysis of proposed prices and costs.  Nevertheless, her application does not indicate how this experience relates to the job positions listed in her form

---

[74] *Id.* at 91-96.

[75] *Id.* Ex. 2 at 8.

171.[76]  Thus, it is impossible to determine whether she performed these duties for a full year, and in what capacity she performed them.

Bullock contends that her experience is the same as the selected applicant, Joyce Hicks.  There is a significant difference between the qualifications of Bullock and Hicks, however.  Bullock performed these duties at the GS-04 level, while Hicks performed these duties at the GS-05 level.  The GS-07 Contract Administrator trainee position requires one year of contract administration experience at the GS-05 level.  Bullock's contract administration experience is limited to the GS-04 level.  Her experience at the GS-05 level is secretarial.

The court therefore finds that Bullock has not demonstrated that she was qualified for the position of Contract Administrator, because she did not have the requisite specialized experience related to, or directly in, contract administration at the GS-05 level.  Bullock's duties at the GS-05 level are computer related or secretarial.  Even if she worked with contracts when she input data into the system, there is no evidence that she worked with contracts substantively by administering, analyzing, evaluating, or negotiating them.  Moreover, even if Bullock did have the requisite

---

[76] *Id.* at 16.

39

specialized experience, it would be impossible to determine so from her misleading and incomplete application.

### IV. CONCLUSION

Bullock cannot prevail on her claim because she has failed to demonstrate that her age was a determining factor in the decision not to promote her to Contract Administrator.  Bullock has not produced direct evidence that Gerstner or Blakely were motivated by a discriminatory animus.  She cannot make a showing of age discrimination through circumstantial evidence because her application was not sufficient to indicate that she was qualified for the position of Contract Administrator trainee. Therefore, the court finds defendant's motion is due to be granted.  An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this the _28th_ day of September, 2000.

United States District Judge